UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| RODNEY F. SPRINKLES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:15-cv-01252-RLY-MJD |
| | ) | |
| WSG MANUFACTURING, LLC, and | ) | |
| WEAVER POPCORN COMPANY, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Rodney F. Sprinkles, is a former employee of Defendants, WSG

Manufacturing, LLC and Weaver Popcorn Company, Inc. (collectively "WSG").[1]  He

alleges his termination was the product of disability discrimination (Count I) and

retaliation (Count II), in violation of the Americans with Disabilities Act, 42 U.S.C. §

12101, *et seq.*, as amended by the ADA Amendments Act of 2008 ("ADAAA").  He

further alleges his termination was in violation of Indiana public policy (Count III).

WSG now moves for summary judgment.  For the reasons set forth below, WSG's

motion is **GRANTED**.

---

[1] WSG is a subsidiary of Weaver Holdings, Inc., which also owns a separate subsidiary, Weaver
Popcorn Company, Inc. ("Weaver"), which processes raw popcorn and manufactures a variety of
popcorn products at its Van Buren, Indiana facility for both commercial and consumer use.
(Filing No. 28-2, Affidavit of Alvin Corbett ¶ 3).  Defendants deny that Plaintiff was jointly
employed by WSG and Weaver, but acknowledge that this issue is immaterial to the outcome of
their Motion for Summary Judgment, as the arguments Weaver advances are duplicative of
WSG's arguments.  Therefore, for the purposes of this Entry, it is assumed Weaver was a joint
employer of Plaintiff.

## I.   Material Facts

### A.   WSG Manufacturing, LLC and Weaver Popcorn Company, Inc. and Rodney Sprinkle's Employment

WSG manufactures and packages "Ready to Eat" popcorn products at its facility in Whitestown, Indiana.  (Filing No. 28-1, Deposition of Rodney Sprinkles ("Plaintiff Dep.") at 4-5).  On April 14, 2014, WSG hired Plaintiff as a Team Leader.  (*Id.* at 4).  In June 2014, WSG promoted Plaintiff to Production Manager, and he became responsible for all aspects of WSG production, supervising the entire production staff of about 50 employees at the facility.  (*Id.* at 4-5).

### B.   Plaintiff's Injury

On the morning of August 21, 2014, Plaintiff sustained a concussion when he fell in the WSG facility.  (*Id.* at 33).  That evening Plaintiff was examined at Indiana University Health Tipton Hospital where CT scans of his head and cervical spine revealed no abnormalities.  (*Id.* at 37-38).  On Plaintiff's behalf, WSG reported the accident to its worker's compensation third party administrator and arranged for him to be seen by an approved physician through St. Vincent on August 25, 2014.  (*Id.* at 14, 39, 45, 87).

Plaintiff asserts that immediately after the injury, he slept for fourteen (14) hours per day and suffered from headaches, panic attacks, memory loss, and trouble controlling his temper.  (*Id.* at 77).  Plaintiff continues to experience cognitive impairments due to post-concussion disorder, and takes medication (Paxil) for anxiety and panic attacks.  (*Id.*

at 8; Filing No. 30-28, Declaration of Rodney F. Sprinkles ("Plaintiff Decl.") ¶ 4).

Strenuous physical and mental activities exacerbate his condition.  (Plaintiff Decl. ¶ 6).

Plaintiff was off work from August 22 until September 2, 2014, following the

accident and then off and on for a few more days as he was evaluated by other providers

who issued temporary restrictions.  (Plaintiff Dep. at 45, 49-51).  On September 12, 2014,

Plaintiff's medical record indicates a diagnosis of post-concussion syndrome.  (Filing No.

30-8, Medical Record at 6).  From mid-September until mid-December of 2014, Plaintiff

was released to return to work full-time, without any restrictions.  (Plaintiff Dep. at 52-

53).

On December 4, 2014, Plaintiff sent an email entitled "Concussion symptoms" to

Will Weaver, Weaver Popcorn Chief Operating Officer; Tom Mathews, Senior Leader;

Alvin Corbett, WSG Director of Operations; and Kellie Fisher, WSG's safety

representative, which stated:

> The doctor said I should see a neurologist and get my symptoms under
> control before returning to work.
>
> In the last 2 weeks my headaches have gotten worse.  It's a constant moderate
> headache and gets much worse as the day goes on, [sic] by the time I get
> home I have to lay down in a dark quite [sic] room.  My wife and family have
> said I've not been myself the last month, my demeanor has changed.
>
> I really want to be a part of WSG going forward, . . . [b]ut at this time; [sic]
> I have to get myself healthy for my family and myself.

(Filing No. 30-12, 12/4/2014 Email from Plaintiff).  Fisher set-up an appointment for him

with Dr. Theodore A. Nukes of Heartland Neurology.  (Plaintiff Dep. at 53-54, 101).  On

December 15, 2014, Dr. Nukes saw Plaintiff for post-concussion syndrome and placed

him off work pending further evaluation.  (*Id.* at 54-55; Filing No. 30-8, 12/17/14 Letter).

Plaintiff remained off work through December 29, 2014.  (Plaintiff Dep. at 55).

On December 29, 2014, Dr. Nukes released Plaintiff to return to work with the

restriction that he work no more than four hours per day until January 12, 2015, at which

time Plaintiff could return to full duty with no restrictions.  (*Id.*).  Pursuant to Dr. Nukes'

orders, Plaintiff began working four-hour days.  (*Id*)

### C.     WSG Fails an AIB Quality Audit and Fires Its Quality Manager

WSG's Quality Department is tasked with maintaining and overseeing the quality

of its Ready to Eat popcorn products.  (Corbett Aff. ¶ 4).  The American Institute of

Baking International ("AIB") conducts audit inspections of the facility.  (*Id.*).  Failed AIB

audits can lead to loss of certification and potential closure of the entire facility.  (*Id.*).

On November 5 and 6, 2014, AIB conducted an audit of WSG.  (*Id.* ¶ 5).  Several

deficiencies were noted by AIB, resulting in an "unsatisfactory" rating.  (*Id.*).  As a result

of the failed AIB audit, WSG terminated the employment of its Quality Manager, James

LeFort, and concentrated on improving the process for the quality production of products.

(*Id.*; Plaintiff Dep. at 63).  WSG knew that AIB would return in January 2015 for a re-

audit, but did not know the specific date.  (Corbett Aff. ¶ 5; Plaintiff Dep. at 64).

In preparation for AIB's return visit, WSG conducted its own mock audits.

(Corbett Aff. ¶ 6; Plaintiff Dep. at 64).  After the first day of the mock audit, January 6,

2015, Corbett sent an urgent e-mail message at 6:17 p.m. to several supervisory

employees, including Plaintiff, stating in part:

> Gentlemen, our AIB audit is imminent! It could take place beginning
> tomorrow, it will take place this month and we must pass.  I understand we
> have had some serious items identified during the first day of our mock audit
> . . . These behaviors will cause us to fail which will ultimately shut this
> operation down with the loss of all jobs associated with WSG.  We do not
> have the luxury of time following our mock audit to address failures like we
> did in November.  Each shift will be covering GMP related items during your
> pre-shift meetings and I expect all of us to immediately address behaviors
> and conditions on the floor.

(Plaintiff Dep. at 64-65; Plaintiff Dep. Ex. 19 at 19; Corbett Aff. ¶ 6).

### D.    WSG's Daily Sanitation Inspections, Emails Regarding the Same, and Plaintiff's Termination

WSG conducts daily sanitation inspections at the beginning of each shift and

requests that a worksheet documenting the inspections be completed daily and submitted

to the Quality Department.  (Plaintiff Dep. at 101-02; Corbett Aff. ¶ 7).  On January 6,

2015, Angelina Boampong, a member of the Quality Department, sent an email to

various managers, including Plaintiff, regarding the absence of completed sanitation

checklists.  (Plaintiff Dep. Ex. 20 at 20; Corbett Aff. at 3). Boampong's email, sent at

5:47 p.m., approximately 30 minutes prior to Corbett's email, above, stated:

> We need to be filling out daily/weekly sanitation check lists!!! Why are we
> missing days, [sic] weeks, and months of documentation???  This is really
> sad that at this point we can't complete such a simple task.  If the AIB auditor
> was here today we would have completely failed with our pathetic
> documentation skills. This is unacceptable guys!!!
>
> Daily sanitation inspection must be completed daily!...post op/pre op must
> be completed during wet cleans.
>
> Rodney,
> From today 1/6/15, if production fail [sic] to complete their sanitation
> checklist/startup sheet within the first 30 minutes of start-up production will
> be shut down by QA.

Thanks

(Plaintiff Dep., Ex. 20 at 20).  At 7:41 p.m. that same evening, Plaintiff replied to all

recipients, and stated:

> Thank you Angelina for your wonderful message, [sic] if production does
> not fill out the sanitation list please have QA remind our associations or the
> TL before shutting down production.
>
> Is QA working on getting the forms transferred to the Control Panel in Plex
> or should production take care of this? We as a TEAM will communicate
> where the sanitation forms are.
>
> We need to look constructively at any forms or checks required and have this
> form electronically tied to a [sic] alert (reminder) to start or maintain
> production.  We're not ways near there but this is our goal.  From my
> experience (way too long) manually filled out forms are never 100% and over
> time get worse.  Not making excuses for production but this is what happens.
>
> We're all in this together, [sic] let's get the form in Plex, train the operators,
> work on tying this form to production and an [sic] reminder screen or alarm.

(*Id.*).

Weaver learned of the email from an employee in the Quality Department.

(Weaver Dep. at 55).  He thereafter called a meeting with Corbett and Mathews.  (*Id.* at

56; Corbett Dep. at 29).  They determined that Plaintiff's response was an unacceptable

failure to take responsibility for insufficiencies in his department and a demonstration of

lack of concern for the quality of its products.  (Corbett Aff. ¶ 8; Plaintiff Dep. at 66-67).

They found the email intolerable because it came from WSG's Production Manager, who

was responsible for all production activity on the floor and supervision of the entire

production staff.  (Corbett Aff. ¶ 8).  Corbett testified:

6

> He was terminated because the email that he sent in reply to a quality technician's email did not represent the view of the management team. We felt it undermined the position that we had stated out with the employees on the importance of quality, especially since we were facing an imminent audit that, really, the fate of the facility was in jeopardy, basically everyone's jobs were at risk, and his email didn't reflect support of that. And we thought with a person at that level in the organization, we could not, you know, maintain him as part of the business.

(Filing No. 28-3, Deposition of Alvin Corbett ("Corbett Dep"). at 28. Weaver testified

consistently with Corbett:

> I think what happened is, you know there was an openly derisive email coming as close as you could to making fun of the quality group's, in my opinion, valiant efforts to try and, you know, pass the quality audit, from [Plaintiff]. And in my perspective, that was a really big deal, and I think for most people at Weaver that was a really big deal. Because, again, we're not talking, you know, a minor situation. We're talking, you know, the entire plant will close if you flunk the audit and a hundred people or so would lose their jobs.

(Filing No. 28-5, Deposition of William Weaver ("Weaver Dep.") at 55; *see also* Filing

No. 28-4, Deposition of Thomas Mathews ("Mathews Dep.") at 30) (testifying the

manner in which Plaintiff responds to Boampong's email "displays a contempt for quality

and safety of the product"). Therefore, WSG terminated his employment effective

January 7, 2015. (Plaintiff Dep. at 13; Corbett Aff. ¶ 8). During his employment,

Plaintiff was never given a negative performance evaluation. (Corbett Dep. at 9).

Corbett and Mathews assert that at no time, prior to the decision to terminate

Plaintiff's employment, was there any discussion of any medical condition he had or any

workers' compensation claim related to him, nor did these matters factor into the decision

to terminate his employment. (Corbett Aff. at 4; Corbett Dep. at 41-42; Mathews Dep. at

28).

7

All other facts necessary to a determination of this motion will be addressed in the Discussion Section below.

## II.    Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A factual issue is material only if resolving it might change the outcome of the case under the governing law.  *Clifton v. Schafer,* 969 F.2d 278, 281 (7th Cir. 1992).  A factual issue is genuine only if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the evidence presented. *Anderson,* 477 U.S. at 248.

The movant bears the initial responsibility of informing the district court of the basis of its motion, and identifying those portions of designated evidence which demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).  After "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986) (quotation marks and citation omitted).

In deciding a motion for summary judgment, the court "may not 'assess the credibility of witnesses, choose between competing reasonable inferences, or balance the relative weight of conflicting evidence.'"  *Bassett v. I.C. Sys., Inc.*, 715 F. Supp. 2d 803, 808 (N.D. Ill. 2010) (quoting *Stokes v. Bd. of Educ. of the City of Chicago*, 599 F.3d 617, 619 (7th Cir. 2010)).  Instead, it must view all the evidence in the record in the light most

8

favorable to the non-moving party and resolve all factual disputes in favor of that party.

*Anderson,* 477 U.S. at 255.

## III.   Discussion

WSG moves for summary judgment on Plaintiff's claims alleging: (1) disability discrimination, (2) disability retaliation, and (3) wrongful termination in violation of Indiana public policy.  With respect to Plaintiff's first two claims, the threshold issue is whether he was disabled within the meaning of the ADAAA.

### A.   The ADAAA

#### 1.   Disability Under Prong (1)

Title I of the ADAAA prohibits employers from discriminating "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a) (2009).  Plaintiff alleges he was terminated because of his disability, namely symptoms resulting from his workplace injury.  A plaintiff is disabled within the meaning of the ADAAA if: (1) he has a physical or mental impairment that substantially limits one or more major life activities; (2) he has a record of such an impairment; or (3) the employer regarded him as having such an impairment.  42 U.S.C. § 12102(4)(A).  Plaintiff contends his condition falls under prong (1).  Whether an individual has a qualifying disability under the ADAAA is an individualized inquiry.  *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 483 (1999); 29 C.F.R. § 1630.2(j)(iv) ("The determination of whether

an impairment substantially limits a major life activity requires an individualized assessment.").

Under the first prong, the court must evaluate whether the plaintiff's condition constitutes an impairment under the ADA, determine whether any major life activities are affected by the impairment, and assess whether the impairment substantially limits the performance of those major life activities. *E.E.O.C. v. Sears, Roebuck & Co. (Sears)*, 417 F.3d 789, 797 (7th Cir. 2015); *Knox v. Snider*, No. 1:11-cv-00949-TWP-TAB, 2012 WL 592663, at *6 (S.D. Ind. Nov. 27, 2012). "Major life activities" include, but are not limited to: caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working. 42 U.S.C. § 12102(2)(A); 29 C.F.R. § 1630.2(i) (additionally including sitting, reaching, and interacting with others). Furthermore, "a major life activity also includes the operation of a major bodily function, including but not limited to, functions of . . . neurological [and] brain . . . functions." 42 U.S.C. § 12102(2)(B).

Whether a plaintiff's condition "substantially limits" a major life activity is construed broadly in favor of coverage; it is not an exacting standard. *See* 29 C.F.R. § 1630.2(j)(1)(i) ("[T]he term 'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA. 'Substantially limits' is not meant to be a demanding standard."). Under the regulations, "[a]n impairment that is episodic or in remission is a disability if it would substantially limit major life activities when active." 29 C.F.R. § 1630.2(j)(vii). The regulations also

provide that "[t]he effects of an impairment lasting or expected to last fewer than six months can be substantially limiting."  29 C.F.R. § 1630.2(j)(ix).

WSG asserts that Plaintiff is not disabled because his condition was a short-term impairment that had fully resolved.  In fact, WSG likens his post-concussion syndrome to a broken bone.  The evidence viewed in the light most favorable to Plaintiff reflects that his injury had not fully resolved and that, unlike a broken bone, it did not completely heal within a set period of time.  Indeed, Plaintiff's injury occurred on August 21, 2014, and his symptoms remain to this day.  Viewing this evidence in the light most favorable to the plaintiff, a rational jury could find that Plaintiff had a covered disability.

## 2.    Count I, Disability Discrimination

Title I of the ADA prohibits employers from discriminating "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a) (2009).  To establish this claim, the plaintiff must establish his *prima facie* case of discrimination by showing that: (1) he is disabled under the ADA; (2) he was meeting his employer's legitimate employment expectations; (3) he suffered an adverse employment action because of his disability; and (4) similarly situated employees without a disability were treated more favorably.  *Dickerson v. Bd. of Trs. Of Comm. College Dist. No. 522*, 657 F.3d 595, 601-02 (7th Cir. 2011) (citations omitted).[2]  If Plaintiff succeeds in making out

---

[2] Plaintiff asserts *Ortiz v. Wener Enterprises, Inc.*, 2016 WL 4411434 (7th Cir. Aug. 19, 2016) abolished direct versus indirect methods of proof.  To clarify, *Ortiz* abolished "the proposition

his *prima facie* case, the burden shifts to WSG to articulate a legitimate,

nondiscriminatory reason for terminating Plaintiff. *Id.* at 602. If WSG does so, the

burden then shifts to Plaintiff to establish that WSG's reasons are a pretext for

discrimination. *Id.*

### a.      Similarly Situated Individuals

WSG argues that Plaintiff cannot establish his *prima facie* case because he cannot

show that a similarly-situated individual outside the protected class was treated better

than he. The similarly situated analysis requires a context-based examination of all

relevant factors. *South v. Ill. Envtl. Prot. Agency*, 495 F.3d 747, 752 (7th Cir. 2007). The

inquiry generally requires the plaintiff to show that the comparator had the same

supervisor, was subject to the same employment standards, and had engaged in conduct

similar to that of the plaintiff. *Id.* This requirement "ought not be construed so rigidly or

inflexibly that it [becomes] a useless analytical tool." *Id.* Nevertheless, "the comparators

must be similar enough that any differences in their treatment cannot be attributed to

other variables." *Silverman v. Bd. of Educ. Of Chi.*, 637 F.3d 729, 742 (7th Cir. 2011).

At bottom, "the inquiry simply asks whether there are sufficient commonalities on the

key variables between the plaintiff and the would-be comparator to allow the type of

comparison that, taken together with the other prima facie evidence, would allow a jury

---

that evidence must be sorted into different piles, labeled 'direct' and indirect,' that are evaluated
differently. Instead, all evidence belongs in a single pile and must be evaluated as a whole." *Id.*
at *5. The *Ortiz* decision "does not concern *McDonnell Douglas* or any other burden-shifting
framework, no matter what it is called as a shorthand." *Id.*

to reach an inference of discrimination." *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007).

Here, Plaintiff argues that his direct line supervisors, Plant Manager Adam Allen (later replaced by Matt Fox) and Alvin Corbett are proper comparators because they engaged in quality violations by failing to complete daily sanitation checklists, but were not terminated. There is no evidence to substantiate Plaintiff's allegation, but even if there was, Plaintiff was not terminated for failing to complete sanitation checklists. According to WSG, Plaintiff was terminated for sending an email intentionally dismissive of quality concerns once the lack of completed sanitation lists was brought up as an area of needed improvement. Therefore, Allen, Fox, and Corbett are not proper comparators.

Next, Plaintiff argues Kyle Watson, a manager in the Quality Department, is a proper comparator because he sent rude and inappropriate work emails but was not terminated. The worst of the two emails at issue reads:

> We just discussed this during our mock audit!! We have no traceability when there are multiple items on a pallet. All of production is to shut down immediately!! This shit has to stop!! If I have to shut the plant down every 10 minutes until this is corrected on a permanent basis, I will!

(Filing No. 30-19, Email from Watson at 3; *see also id.* at 2 ("Overall sense of urgency to get cleaning completed is severely lacking. . . . The lady on the other rotation was 100% correct when she said people are LAZY!!!")). Watson's email differs from Plaintiff's in one material respect—his emails demonstrate his concern over quality-related issues.

13

Plaintiff's, on the other hand, is derisive of quality concerns.  Therefore, Watson is not similarly situated to Plaintiff.

Lastly, Plaintiff lists six additional lower level employees—Anthony Klowetter, Darrell Lummer, Martin Martinez, Chad Shively, Luke Wilson, and Tony Lovatto—as comparators, claiming that each of them received only disciplinary action for quality violations.  None of these individuals, however, are similarly situated to Plaintiff because none of them held the same management position as he did.  Plaintiff was the Production Manager over the whole plant; a member of senior management is not similarly-situated with subordinates.  *See Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002); *Hoffman v. MCA, Inc.*, 144 F.3d 1117, 1124 (7th Cir. 1998) (same).  Moreover, none of the identified employees sent emails dismissive of quality concerns like Plaintiff did.  Accordingly, Plaintiff fails to identify a similarly situated non-disabled individual who was treated more favorably than he.  Therefore, he fails to establish his *prima facie* case, and his disability discrimination claim must fail as a matter of law.  *Williams v. Airborne Express, Inc.*, 521 F.3d 765, 768 (7th Cir. 2008) ("The failure to establish any single element of the prima facie case dooms a discrimination claim.").

### b.    Pretext

Even if Plaintiff could establish a *prima facie* case of disability discrimination, WSG had a legitimate non-discriminatory reason for terminating his employment. Plaintiff admits that on January 6, 2015, he sent a sarcastic email response, copying several managers, to Boampong from the Quality Department, who had notified the group of deficiencies in missing months-worth of sanitation checklists.  (Corbett Aff. ¶ 7;

Plaintiff Dep. at 69 (testifying he "intended" the email to sound sarcastic "because [Boampong] never came and talked to me.  Nobody mentioned anything of this.")). Plaintiff argues this asserted reason is a mere pretext for discrimination.

First, Plaintiff argues pretext is shown because WSG cannot identify an employee who is willing to take ultimate responsibility for making the decision to terminate his employment.  As support for his argument, he cites this court's decision in *Lyons v. Long Cooling Sys.*, 2000 WL 682658 (S.D. Ind. Feb. 22, 2000).  There, the court found an inference of discrimination based on the "inconsistencies in [the] employer's account of the reasons for firing [the] employee."  *Id.* at *2.  Here, the deposition testimony of Corbett, Mathews, and Weaver reflects that there was consensus among them that termination was the appropriate action.  (Mathews Dep. at 23; Corbett Dep. at 28; Weaver Dep. at 59).  The only discrepancy in their termination lies in their answers regarding who the "ultimate" decision-maker was.  (*See* Corbett Dep. at 28 (testifying the three decision-makers were "Will Weaver, Tom Mathews, and myself," but that the ultimate decision-maker was "Will Weaver."); Mathews Dep. at 23 (testifying the three came to a consensus to terminate Plaintiff, but ultimately, "the owner of the company could have said one way or the other."); Weaver Dep. at 59 (testifying he would "imagine" both Mathews and Corbett recommended termination, that he agreed with their recommendation, but that the ultimate decision "is always the manager's responsibility")).  This is not the type of discrepancy which raises an inference of discrimination, as there is no conflict in the evidence regarding the *reasons* for the adverse action.  *See Bagew v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 881-82

15

(7th Cir. 2016) (holding the decision-maker's "explanations must actually be shifting and inconsistent to permit an inference of mendacity") (quoting *Schuster v. Lucent Techs., Inc.*, 327 F.3d 569, 577 (7th Cir. 2003)).

Next, Plaintiff argues that WSG was aware, by virtue of his December 4 "Concussion symptoms" email, that the concussion he suffered had affected his demeanor. He surmises that WSG should have taken that into account before terminating his employment. "A reasonable jury may conclude," he argues, "that Defendant would not tolerate a disabled employee who fundamentally changed his demeanor and temper after being concussed." (Filing No. 29, Response at 31). Plaintiff's argument rests on pure speculation and conjecture. On summary judgment, the court may not make this type of speculative leap. *Collins v. Am. Red Cross*, 715 F.3d 994, 997 (7th Cir. 2013) (holding the court "will not draw inferences that are supported by only speculation or conjecture").

In addition, Plaintiff argues that in December 2014, Carlton Stewart, his subordinate, asked Plant Manager Adam Allen when he (Plaintiff) would be returning to work. (Filing No. 30-5, Declaration of Carlton Stewart ¶ 4). Allen responded that "Tom [Mathews] knew somebody that heard [Plaintiff] was looking for a lawyer to sue them because of his injuries," and "[Plaintiff] probably won't be coming back." (*Id.*). Plaintiff, however, does not connect this alleged statement to the later decision to terminate him after he sent the email derisive of quality. *See Fuka v. Thomson Concumer Elec.*, 82 F.3d 1397, 1403 (7th Cir. 1996) (holding a plaintiff must demonstrate that seemingly stray workplace remarks were related to the employment decision in question;

16

otherwise, the remark fails to give rise to an inference of discrimination).  In fact, Mathews did not think that Plaintiff was going to sue Weaver or WSG (Mathews Dep. at 61); Corbett testified that he had not heard a rumor that Plaintiff spoke to a lawyer prior to the termination decision (Corbett Dep. at 50); and Weaver similarly stated he had no knowledge of Plaintiff speaking with an attorney (Weaver Dep. at 135).  Moreover, the attributed statement, "Rod probably won't come back" fails to show pretext, as it could easily have meant that Plaintiff might opt on his own not to return, not that WSG had prevented him from doing so.  Indeed, WSG did allow Plaintiff to return to work after the alleged statement, thus negating any retaliatory interpretation.

Plaintiff further argues "the email at issue, on its face, does not justify the termination of [him]."  (Response at 28).  Plaintiff's opinion of the appropriate level of discipline for his email is irrelevant, so long as the decision-makers honestly believed that his termination was appropriate.  *Tyler v. Trs. of Purdue Univ.*, 834 F. Supp. 2d 830, 840 (N.D. Ind. 2011) ("The Court does not sit as a 'super-personnel department,' weighing the wisdom of a company's employment decisions; rather [it is] concerned only with whether the employer's proffered explanation was honest.") (internal quotation marks and citation omitted)).  Here, Plaintiff fails to raise a genuine issue of material fact with respect to whether WSG honestly believed the asserted reason for his termination.  Indeed, WSG has terminated employees in the past who did not take quality seriously.  For example, WSG immediately fired its Quality Manager when it failed the November 2014 AIB audit.  (Corbett Aff. ¶ 5).  And last, but not least, Plaintiff admits that he would have disciplined a subordinate for sending the same email.  (Plaintiff Dep. at 67 ("I said I

17

wouldn't allow one of my employees to write an email like that to them, that I would discipline them.").

And finally, although Plaintiff's condition persists, at the time of his termination, he had been released to return to work full time by January 12, 2015. Therefore, while he was terminated during his two-week modified work schedule, there is no evidence that WSG *knew* his condition was of a lengthy duration. *Hedberg v. Ind. Bell Tel. Co., Inc.*, 47 F.3d 928, 934 (7th Cir. 1995) ("The ADA does not require clairvoyance.").

For these reasons, the court finds no reasonable jury would conclude Plaintiff was terminated because of his disability. Therefore, the court must **GRANT** WSG's Motion for Summary Judgment on Count I of Plaintiff's Complaint for disability discrimination.

### 3.    Count II, Retaliation

The ADAAA prohibits employers from retaliating against employees who assert their right under the Act to be free from discrimination. 42 U.S.C. § 12203(a). Here, Plaintiff alleges that he engaged in protected activity[3] under the ADAAA and was terminated because of it. To prevail on this claim, a plaintiff must establish a *prima facie* case of retaliation by showing that: (1) he engaged in protected activity; (2) he was performing his job satisfactorily; and (3) he was singled out for an adverse employment action that similarly situated employees who did not engage in protected activity did not suffer. *Dickerson v. Bd. of Trs. of Comm. Coll. Dist. No. 522*, 657 F.3d 595, 601-02 (7th

---

[3] Plaintiff's requests for reasonable accommodations constitute protected activity under the ADAAA. *Silk v. City of Chicago*, 194 F.3d 788, 800 (7th Cir. 1999). Plaintiff engaged in protected activity when he requested medical leave from work and a modified work schedule due to his disability. Notably, Defendants do not contest this element.

Cir. 2011).  Like a disability discrimination claim, once a plaintiff satisfies his initial

burden, the burden then shifts to the defendant to present a non-invidious reason for the

adverse employment action.  If the defendant meets this burden, the plaintiff must then

demonstrate that the defendant's proffered reason was pretextual.  *Id.* at 602.

Plaintiff's retaliation claim relies on the same comparators the court has just

rejected in its analysis of his disability discrimination claim.  Therefore, the court must

find he cannot establish that he was singled out for an adverse employment action that

similarly situated employees who did not engage in protected activity did not suffer.  *Id.*

at 601-02.

Moreover, for the same reasons set forth above with respect to Plaintiff's disability

discrimination claim, Plaintiff cannot rebut WSG's legitimate reason for terminating his

employment.  Furthermore, with specific regard to this claim, Plaintiff admitted in his

deposition that WSG fully accommodated him by initiating his workers' compensation

claim, granting him his requests for medical leave and his request for a modified work

schedule (4-hour work days).  (*See* Plaintiff Dep. at 47, 49, 50, 52, 55-56, 60).  For these

reasons, the court finds no reasonable jury would find Plaintiff was terminated because he

engaged in protected activity.  Therefore, the court must **GRANT** WSG's Motion for

Summary Judgment on Count II of Plaintiff's Complaint for retaliation.

### B.    Wrongful Termination in Violation of Indiana Public Policy— *Frampton* Claim

Only one state law claim remains—Plaintiff's retaliatory discharge claim.

Pursuant to 28 U.S.C. § 1367(a), the court may hear all claims that "are so related to

19

claims in the action within such original jurisdiction that they form part of the same case or controversy." In the present case, the court will exercise supplemental jurisdiction over this claim as it arises from the same case or controversy.

Plaintiff's common law retaliatory discharge action is commonly called a "Frampton" claim. *Frampton v. Central Indiana Gas Co.*, 260 Ind. 249 (1973). In the case from which it derives its name, the Indiana Supreme Court held that an employer may not discharge an employee in retaliation for filing a workers' compensation claim. *See Markley Enterprises, Inc. v. Grover*, 716 N.E.2d 559, 565 (Ind. Ct. App. 1999). "To maintain a *Frampton* claim, [plaintiff] must establish a causal connection between his termination and the filing of his workers' compensation claim." *Hudson v. Wal-Mart Stores, Inc.*, 412 F.3d 781, 785 (7th Cir. 2005) (addressing Indiana law). His *prima facie* case thus consists of three elements: (1) he filed a workers' compensation claim; (2) he was terminated from his employment; and (3) there is a causal connection between the filing of his workers' compensation claim and his termination. *Mullins v. Lobdell Emery, Inc.*, NA 01-3-C B/S, 2002 WL 459040, at *4 (S.D. Ind. March 21, 2002).

The evidence establishes that WSG filed a workers' compensation claim on his behalf. Nevertheless, Plaintiff attempts to establish the first element of his *prima facie* case by arguing that his wife called Dudley Berthold, Defendants' Safety and Health Representative, and stated their intent to pursue workers' compensation remedies. However, the portions of the deposition cited by Plaintiff do not even discuss his workers' compensation claim, and to the extent they discuss his wife's conversations and actions, Plaintiff testified: "We'd have to ask Linda [his wife]." (Plaintiff Dep. at 37).

Furthermore, Plaintiff's own testimony dooms his claim: "I don't know, really, how [the worker's compensation claim] was filed. . . . I assumed that Dudley took care of it or that WSG took care of it." (*Id.* at 60). Plaintiff thus fails to satisfy his *prima facie* case. Therefore, the court must **GRANT** WSG's Motion for Summary Judgment on Count III of Plaintiff's Complaint for retaliatory discharge.

## IV.    Conclusion

The court finds no genuine issue of material fact exists on Counts I-III of Plaintiff's Complaint and that judgment must be entered in favor of WSG.   Accordingly, WSG's Motion for Summary Judgment of Plaintiff's Complaint (Filing No. 26) is **GRANTED**.

**SO ORDERED** this 31st day of March 2017.

RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record